**Timothy R. Volpert**, OSB No. 814074
Email: tim@timvolpertlaw.com
Tim Volpert PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (503) 703-9054

**Ethan Levi**, OSB No. 994255
Email: ethan@lmhlegal.com
**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Noah Horst**, OSB No. 076089
Email: noah@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **DONNA THAMES, COLUMBIA BAR & GRILL, INC., an Oregon corporation,** *dba* **EXOTICA**<br><br>Plaintiffs,<br><br>vs.<br><br>**CITY OF PORTLAND, a municipal corporation; STEVEN MARKS; JOHN ECKHART; DAVID LUSTER; JEFFREY BELL; SHANNON HOFFEDITZ; DAN MCNEAL; MIKE BOYER; MERLE LINDSEY; MARK KRUGER; JASON TALLMADGE**<br><br>Defendants. | 3:16-cv-1634-PK<br><br>**PLAINTIFFS' SECOND AMENDED COMPLAINT**<br>**Civil Rights Violations**<br>**(42 U.S.C. §§ 1981, 1983, 1985, 1986, & 2000)**<br><br>**Assault; Battery; Intentional Interference with Business Relations; False Arrest; Intentional Infliction of Emotional Distress**<br><br>**Jury Trial Demanded** |

Plaintiffs Donna Thames and Columbia Bar & Grill, Inc., dba Exotica, by and through their attorneys, Tim Volpert and Levi Merrithew Horst PC, hereby allege:

## NATURE OF THE CASE

1.      This is a case about unconscionable, illegal conduct creating insurmountable obstacles to success of black club owners, clubs catering to black people, and clubs offering entertainment and playing music appealing to black people. Plaintiffs will refer to such clubs collectively below as "black clubs." The facts alleged below are not unique. The City of Portland (hereinafter "the City"), working in partnership with state liquor authorities, has a long and shameful history of knowingly and intentionally targeting black clubs with all of their regulatory power in a concerted effort to drive the clubs out of business. This continuing history amounts to a custom or policy.

2.      Plaintiff Donna Thames was the owner of the former Portland gentlemen's club known as "Exotica" (sometimes referred to below as "the Club.") from 2010 until 2015. Exotica was a black club. Ms. Thames operated Exotica to provide an entertainment venue featuring exotic dancing, hip-hop music and other types of music and entertainment of particular interest to the Club's predominantly black clientele. Ms. Thames operated her Club for over five years subject to draconian and discriminatory license restrictions imposed by the Oregon Liquor Control Commission (hereinafter "OLCC") and its representatives. During that time, Ms. Thames had a spotless regulatory record. Yet the OLCC, Steven Marks, its Executive Director, other OLCC employees and others working in concert with them refused to even consider lifting the restrictions as the law required. Instead, they systematically and knowingly violated Ms. Thames' constitutional rights and subjected her to physical and mental abuse, false arrest and inflicted emotional distress.

3.      Meanwhile, when the OLCC defendants' efforts to strip Ms. Thames of her liquor license floundered, the City of Portland, including several employees of the City's Office of Neighborhood Involvement stepped in and sought to cripple her business by misapplying the time, place, and manner ordinance. The decision to do so was based on Ms. Thames' race, the music she played, and the customers she catered to. These two efforts eventually succeeded in

driving plaintiff out of business.

4.    The defendants here and others referred to below, worked in concert, conspired or acted in furtherance of a conspiracy to severely limit Ms. Thames' personal freedom and freedom to operate her business and ultimately to put Exotica out of business.

5.    The racially-discriminatory conduct of these public bodies and individuals, described below, violated the rights and privileges afforded to Ms. Thames and her business under the United States Constitution, including her right to be free from physical, mental and economic abuse, her right to be free from unlawful seizure under the Fourth Amendment, her right to equal protection guaranteed by the Fourteenth Amendment, her right to freedoms of speech and expression guaranteed by the First Amendment, as well as rights guaranteed by state common law. Defendants' actions forced Ms. Thames and her company out of business, resulting in significant economic harm, as well as significant pain and suffering including mental, physical, and emotional distress.

6.    Public officials and employees, in practice, treated (and continue to treat) similarly situated clubs with non-black owners and clubs that do not cater to black individuals or play hip-hop music with much greater leniency and respect. This action seeks damages for violation of the plaintiffs' civil rights.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over plaintiffs' claims of violation of federal constitutional rights pursuant to 28 U.S.C. §§ 1331(a) and 1343 because the causes of action arise under 42 U.S.C. §§ 1981, 1983, 1985, 1986, & 2000. This Court has jurisdiction over plaintiffs' pendent state law claims under 28 U.S.C. § 1367.

8.    Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in the District of Oregon and because defendants are subject to personal jurisdiction in the District of Oregon.

## PROCEDURAL REQUIREMENTS

9.      All administrative prerequisites to filing this action have been timely filed. State defendants acquired actual knowledge of the claims arising out of the August 15, 2014 incident on or shortly after that date.   Plaintiffs provided formal tort claims notices for all other conduct alleged herein to the OLCC and the City of Portland on or about October 27, 2015.

## PARTIES

10.      At all material times, plaintiff **COLUMBIA BAR & GRILL, INC.,** was an Oregon corporation, *dba,* Exotica.

11.       At all material times, plaintiff **DONNA THAMES** was a resident of Oregon and the owner of Columbia Bar and Grill, Inc.

12.      At all material times, defendant **CITY OF PORTLAND** was and is a municipal corporation operating under Oregon law.

13.      At all material times, defendant **STEVEN MARKS** was the Director of the OLCC. He is sued in his individual capacity.

14.      At all material times, defendant **JOHN ECKHART** was employed by the OLCC as Director of Public Safety.  He is sued in his individual capacity.

15.      At all material times, defendant **DAVID LUSTER** was employed by the OLCC as an Inspector.  He is sued in his individual capacity.

16.      At all material times, defendant **JEFFREY BELL** was employed by the OLCC as an Inspector**.**  He is sued in his individual capacity.

17.      At all material times, defendant **SHANNON HOFFEDITZ** was employed by the OLCC as a Regional Manager.  She is sued in her individual capacity.

18.      At all material times, defendant **DAN MCNEAL** was employed by the OLCC as a License Inspector.  He is sued in his individual capacity.

19.      At all material times, defendant **MIKE BOYER** was employed by the City's Office of Neighborhood Involvement as a Liquor License Program Coordinator.  He is sued in

his individual capacity.

20.     At some material times, defendant **MERLE LINDSEY** was employed as Executive Director of the OLCC.  He is sued in his individual capacity.

21.     At all material times, defendant **MARK KRUGER** was employed by the Portland Police Bureau as the captain of the Drugs and Vice Division.  He is sued in his individual capacity.

22.     At all material times, defendant **JASON TALLMADGE** was employed by the OLCC as an Inspector**.**  He is sued in his individual capacity.

23.     All Defendants acted under color of state law at all times relevant to this complaint.

## FACTUAL ALLEGATIONS

**A.     History of the City's Discrimination Against Black Clubs.**

24.     From the founding of the state of Oregon until the 1920s, it was illegal for black people to live anywhere in the state. The state was openly marketed to Americans in the east as a white utopia. In the 1920s, when black people were finally allowed to live in Oregon to satisfy the growing need for cheap labor, they were excluded from the existing social fabric and sought to form their own. That effort was met with violent opposition by the City's large chapter of the Ku Klux Klan, and legal opposition by City officials, including the mayor and chief of police, who openly supported the Klan.  Throughout all of Portland's history, the City, working in concert with the OLCC, has used its regulatory power to target and discriminate against black clubs and force them out of business.  The following paragraphs are examples of that continued, uninterrupted course of conduct dating back to the 1920s.

25.     In the 1920s, the Golden West Hotel was the only business in Portland catering to black people and owned by a black man. Located at Northwest Third and Davis, the Golden West contained a hotel, a restaurant, a barbershop, and a soda fountain. It functioned as a cultural hub for black Portlanders, and often hosted jazz performances. The City tried to shut the Golden

West Hotel down several times, citing noise complaints, liquor violations, and prostitution. City officials eventually got their wish in 1931, when the owner closed the business and opened a new hotel in in the new black district of Albina.

26.     From the 1930s through the 1960s, black Portlanders were left to their own affairs provided they stayed within the racially segregated, red-lined neighborhood of Albina. In the late 1950s, that neighborhood was pushed further north when the City took the southern end of the neighborhood to construct the Memorial Coliseum.

27.     Around 1940, Sherman Picket and Charles "Pat" Patterson opened the Dude Ranch club at 240 NE Broadway Avenue. Both men were black and they booked music that catered to black people. Thelonious Monk, Nat King Cole, and Coleman Hawkins all played at the Dude Ranch. Beginning in late 1945, however, young white people began going to the Dude Ranch, and the City and the OLCC stepped up efforts to shut it down. They issued liquor violations and pushed other regulatory enforcement. In 1946, the club lost its lease as a result of the enforcement actions. When the owners attempted to reopen the club further north on Union Avenue, the OLCC denied their application for a license.

28.     The Cleo-Lillian Social Club opened in the mid-1950s on North Williams Avenue, in the Albina neighborhood. It operated as a private social club owned and frequented by its largely black members. Duke Ellington once performed at the club. As more white people began moving to Albina in the 1990s, the City and OLCC began pressuring the club with noise and liquor license complaints, and eventually succeeding in shutting the club down in 2001.

29.     In 2004, La Von Van, a black man, bought LV's Sports Bar Restaurant and Lounge, several blocks north of the former site of the Cleo-Lillian Social Club. The business was a gathering spot for the local black community, even as the neighborhood around it became increasingly white. When Mr. Van first bought the business, the City refused to assist in his complaints of criminal activity in the neighborhood. However, in 2008, the City and OLCC turned their regulatory attention on the club. In 2012, the OLCC moved to suspend the bar's

liquor license twice, citing a history of violations generated through inordinate regulatory attention. When he received the second notice of proposed suspension on October 31, 2012, Mr. Van closed the bar, citing the financial burden imposed by the OLCC. LV's Sports Bar Restaurant and Lounge was the last black owned bar in the Albina neighborhood. It was demolished shortly after closing to make room for a luxury office building.

30.     In August of 2006, following a shooting four blocks from a rap concert in downtown Portland, then Central Precinct Lieutenant Todd Wyatt stated: "It's not a coincidence that all these shootings happen after a rap concert. We don't want to say that because we don't want to be labeled as racist, but if you line up the shows, and line up the numbers, there's a correlation."

31.     There were 27 homicides in Portland in 2006. None of them were in any way related to any rap concerts.

32.     In 2008, the Crown Room opened in Portland's Chinatown neighborhood, two blocks from where the Golden West Hotel once operated. The club presented a mix of music, including a hip-hop night every Saturday night. The hip-hop nights drew a mixed crowd with a plurality of young black people. The Crown Room received an inordinate amount of regulatory attention from the Portland Police Bureau, Neighborhood Involvement, the Fire Bureau, and OLCC. Ultimately, a series of minor liquor violations led to a prolonged suspension, and the club was forced to close. None of those clubs, however, host hip-hop nights or cater to young black people.

33.     In March 2010, Beauty Bar, a small national chain of successful nightclubs, opened in downtown Portland. The venue hired a nationally recognized promoter named Chase Freeman, a black man, to host weekly dance nights on Saturday nights. Mr. Freeman followed the same successful formula he had used in cities such as New York and Atlanta to create a mix of dance music events featuring local and national DJs focused around hip-hop music. The formula was a success in Portland as well, drawing a mixed crowd with a plurality of young

black people. However, the Portland Police Bureau and Fire Bureau began focusing on the club as it became successful. Despite the absence of noise complaints or incidents of violence at the club, Portland officials again began focusing inordinate regulatory attention on it. The Fire Bureau cited the club twice for capacity violations and pressured the club to fire the promoter. The owners did so in late March 2012 and closed the club soon after.

34.     In March 2011, Samuel Thompson, a young black man, opened Seeznin's Bar & Lounge on 82nd Avenue in Portland. The bar catered to young black people. PPB and the OLCC immediately focused an inordinate amount of attention on the bar. In June 2011, a man was shot and killed in the parking lot across the street from the bar. The OLCC and PPB blamed the bar for the homicide. The OLCC  immediately issued excessive and crippling restrictions on Mr. Thompson's liquor license. Those restrictions made it impossible for Mr. Thompson to continue to operate the business profitably and he was forced to close. In 2011, there were four homicides on or very near 82nd Avenue. Seeznin's was the only establishment closed as a result.

35.     Rodney DeWalt, a black man, opened a Portland nightclub known as the Fontaine Bleau on Northeast Broadway, just a few blocks from the former home of the Dude Ranch, in January 2013. The Fontaine Bleau was a black club. Mr. DeWalt opened the Fontaine Bleau to provide an entertainment venue featuring hip-hop music. Thereafter, the City, through its Police Bureau, its Fire Bureau, the Mayor's office, the Office of Neighborhood Involvement, and Steven Marks, director of the OLCC, worked in concert, conspired or acted in furtherance of a conspiracy to severely limit Mr. DeWalt's freedom to operate his business and ultimately to close the Fontaine Bleau.

36.     Presently, black people in Portland comprise approximately 6.3 percent of the population, but there are only three black-owned clubs or bars in the city. These establishments cater to a much older audience and do not play hip-hop music. There are no currently operating black clubs in Portland catering to young black people and playing hip-hop music. City authorities claim that gang violence continues to rise.

37.     Hip-hop music is more than just a genre of music. It is the expression of an entire American culture—that of young, urban black people. It is rooted in African and African-American musical traditions: the African oral tradition, soul, jazz, gospel, and reggae. Hip-hop lyrics are concerned with the subjects that are most relevant for the community that creates it. As such, rap or hip-hop has been referred to as the "CNN for black people," filling a void left by the white media.

**B.      Plaintiffs' operation of Exotica.**

38.     Plaintiff Donna Thames is a black woman who at all material times resided in Washington County, Oregon.

39.     On or about June 2010, Ms. Thames became the sole owner of Columbia Bar & Grill, Inc., *dba* Exotica.  In that role, she operated a gentlemen's club in Portland, Oregon called "Exotica."  (sometimes referred to below as "the Club").  Exotica was located at the intersection of NE Columbia Blvd. and NE Martin Luther King Blvd.  The Club was a cultural landmark in the black community in Portland.

40.     Ms. Thames purchased the business for $825,000 on a six-year contract at 12 percent interest.  She and the business leased the building, contracted with the owner for the street improvements and leased equipment for the Club.

41.     The staff at the Club was ethnically diverse and predominantly black.

42.     The Club's patrons were also predominantly black.  They included a diverse mix of blue-collar workers, business professionals, professional athletes, well-known celebrity comedians, hip-hop artists and actors.  It was not unusual for famous people in the black community to show up at the Club (both announced and unannounced) when visiting Portland. The Club was one of three clubs in Oregon selected by Playboy Entertainment to be featured in a documentary on high-end adult nightclubs.

43.     Ms. Thames maintained 15 to 20 salaried employees and approximately 100 independent contractors.  The Club's annual payroll was $360,000.

44. Ms. Thames was granted a security and retailer's contract by the Oregon Lottery. The video poker machines in the Club grossed as much as $2.9 million annually. Absent good cause, the Oregon Lottery could not revoke her license to continue to operate the machines.

45. Before becoming the owner of the business, Ms. Thames had been employed by the previous owner at the Club as executive assistant for over a decade. In that capacity, plaintiff handled human resources, administrative duties, bookkeeping, and day-to-day operations in the back of the house. Also, in that role, Ms. Thames attended meetings with the City and State, including Portland Police Bureau and OLCC meetings. She testified at administrative hearings and oversaw legal issues involving the Club.

46. On or about January 2010, Ms. Thames applied with the OLCC for a 90-day, temporary permit to operate the business. The OLCC denied the application. Ultimately, however, the OLCC issued a full commercial on-premises license on August 20, 2010. However, the OLCC imposed several license restrictions as conditions to approval. Those restrictions included the following:

> (1)     the Club was required to have three DPSST certified security officers from 9:00 PM to closing on Sunday to Thursday and four DPSST certified security officers from 9:00 PM to closing on Friday and Saturday;
>
> (2)     the parking lot was to be "patrolled" every 15 minutes, seven nights a week, from 9:00 PM to closing;
>
> (3)     at all times of operation, patrons could not simultaneously be in possession of more than one container of alcohol, defined as six ounces of wine, 16 ounces of malt beverage, and no more than two ounces of distilled spirits.

47. Although Ms. Thames had no adjudicated, administrative or legal violations during the five years she ran the Club. After more than two years of running the Club without issues, Ms. Thames made a formal written request to remove the restrictions. OLCC employee defendants and other OLCC representatives, in violation of Oregon law, refused to process her

written request for removal of those restrictions.  Ms. Thames was subject to those restrictions beginning June 10, 2010 and for the entire five years she operated her business.

48.     The OLCC restrictions placed Ms. Thames in constant jeopardy of losing her license.  Any single violation of any restriction could give the OLCC grounds for cancellation of plaintiff's license.  For example, if security was called away to deal with an urgent matter, and as a result, if just one 15-minute parking lot patrol was missed, the OLCC could treat that as a violation of a restriction and revoke Ms. Thames' license.

49.     By contrast, a business named "Skinns," operated by a white person not far from Exotica, experienced two homicides and a shooting involving two more victims in three separate incidents on the premises between 2011 and 2016. Neither the OLCC nor the City imposed any restrictions on that business. It continues to operate.

50.     From the time she assumed ownership in 2010 to when she was forced out of business in 2015, the OLCC never found Ms. Thames in violation of any one of those restrictions.

51.     Ms. Thames, as licensee, remained 100% compliant with all proper OLCC rules, regulations and requirements, and all City rules, regulations and requirements, from the date her license was issued in June 2010 until defendants forced her out of business in July 2015.

**C.     The OLCC defendants failed attempt to revoke Ms. Thames' license in 2013-2014.**

52.     On January 4, 2013, OLCC Inspectors David Luster and Jason Tallmadge visited the parking lot of the Club.  Based on that visit, they falsely accused plaintiffs of failing to assure that routine, 15-minute patrols were made of the parking lot.  Luster and Tallmadge acknowledged the presence of security in the parking lot, but said they were not satisfied the patrol was "thorough."  They informed the manager on duty, Bendrea Andrews, of their displeasure and informed him of the corrective actions they expected.

53.     On January 5, 2013, Luster and Tallmadge paid another visit to the Exotica premises and said that they were pleased with the corrective actions taken by Ms. Thames and

her employees.

54. Shortly after that, Ms. Thames contacted Luster to arrange a meeting to introduce herself, to discuss his two recent visits, and to seek guidance to avoid further allegations of compliance issues. That meeting occurred on January 17, 2013. Luster asked numerous questions about various matters. Tallmadge said at that meeting that Ms. Thames and her predominantly black management and security staff were not sufficiently "cooperative" and made him feel "uneasy." Luster also accused Ms. Thames and her employees of dishonesty, of tampering with documents, and of illegally taping conversations. Luster and Tallmadge told Ms. Thames that such actions constitute felonies. Luster and Tallmadge's allegations were false.

55. The January 17, 2013 meeting increased Ms. Thames' awareness that, given the restrictions and the arbitrary and capricious actions of OLCC inspectors, it was critical to her business to have the restrictions -- imposed more than two years before -- removed.

56. On or about February 4, 2013, Ms. Thames, through her attorney, made a formal, written request to Deborah Tenenholz of the OLCC that these longstanding restrictions on her license be removed. At the time the request was made, and for approximately eight months thereafter, defendant Merle Lindsey was the acting Executive Director of the OLCC. On information and belief, Lindsey was aware of his obligation to bring plaintiffs' formal request to the Commission for consideration and failed to do so.

57. OAR 845-005-0355(6) requires the OLCC to bring a formal request for removal of restrictions to the full Commission within a reasonable amount of time.

58. At the time her attorney requested that the OLCC remove the restrictions, Ms. Thames had been the licensee of the Club for over two and one half years and the OLCC had never alleged a violation.

59. When Ms. Thames closed down her business in July, 2015 -- two and one half years after she formally requested that the restrictions be withdrawn – neither Hoffeditz, Lindsey, Marks nor any other OLCC employee ever brought her requests to remove the

restrictions to the Commission.

60. On April 20 and April 21, 2013, Ms. Thames had six security guards on premises for a special event at the Club. Two of those security guards were assigned exclusively to patrolling the parking lot.

61. On that same night, defendants Luster and Tallmadge were positioned in the parking lot, performing a "compliance check."

62. On April 23, 2013, Luster told Ms. Thames that she was in violation of the parking lot patrol restriction, that she "knows what this means," that she "knows how serious the restriction violation is," but that "this isn't the end of the world" because there "are other things you can do." Ms. Thames understood Luster to mean that he intended to pursue license cancellation because of the alleged violations of the parking lot restriction.

63. Ms. Thames and her attorney subsequently tried to contact Luster regarding the alleged violations. Luster did not respond.

64. On August 12, 2013, the OLCC issued a Notice of Proposed License Cancellation to plaintiff. The Notice charged the Licensee with one violation of OAR 845-005-0355 (failing to comply with a license restriction requiring Licensee to patrol the parking lot area under Licensee's control and the outside areas adjacent to the premises at least every 15 minutes); and two violations of OAR 845-006-0347(3) (permitting unlawful activity). On information and belief, Luster and Tallmadge provided false and misleading information to the Commission in order to cause the OLCC to issue the Notice.

65. On January 27, 20l4, the Commission issued Ms. Thames an Amended Notice of Proposed License Cancellation and Proposed Refusal to Renew License. The Amended Notice alleged one violation of OAR 845-005-0355 (restriction violation) and one violation of 845-006-0347(3) (permitting unlawful activity), and indicated an attempt to refuse to renew the license based on a poor record of compliance under ORS 471.313(4)(g).

66. If any of the alleged Category I violations was established, Ms. Thames would

have lost her OLCC license.

67.     Ms. Thames hired an attorney to contest the allegations at an administrative hearing.

68.     The hearing was held on February 12, 2014, before an administrative law judge.

69.     In advance of the hearing, Luster compiled a myriad of extraneous documentation designed to discredit Ms. Thames in the eyes of the hearing officer.  These documents were intended to suggest that she had, for example, circulated counterfeit money, invited known gang members to patronize the establishment, and even that she had interfered with and withheld evidence in a homicide investigation.  Such documents obviously had nothing to do with the charges at issue, and the innuendo they contained was false and unsupported by any evidence.  Yet somehow Luster's documents found their way into the OLCC hearing record for Ms. Thames' license cancellation.  Had it not been for a successful motion made by Ms. Thames' attorney minutes before the hearing began, the hearing record would have contained all of Luster's false and slanderous propaganda about Ms. Thames.  By the time that motion was granted, of course, the administrative law judge had read all of the false and slanderous documents that Luster improperly submitted.

70.     Among those who testified at the hearing were Club manager Andrews, who was patrolling the lot when the violations allegedly occurred, and plaintiff's father, C.L. Thames, who was also in the parking lot as well at the time and witnessed the regular patrols.  Defendants Luster and Tallmadge also testified.

71.     At the hearing, witnesses called on behalf of Ms. Thames testified that there were two security guards patrolling the parking lot at the time of the alleged violations.

72.     Luster and Tallmadge testified to the contrary.

73.     The administrative law judge did not believe Luster or Tallmadge's sworn testimony.  Instead, she accepted the testimony of Ms. Thames' witnesses.

74.     The administrative law judge found that Ms. Thames did not commit any of the

conduct charged for April 2013, but that there was "reason to believe" she might have been negligent in requiring new staff to patrol the lot every 15 minutes in January 2013. Taking into consideration that the violation had been corrected on January 5, 2013, and that the April charges were not proven, the administrative law judge imposed a fine rather than follow the OLCC's proposal that Ms. Thames' license be cancelled.

75.     The OLCC defendants were not satisfied with the hearing officer's ruling and proceeded to seek license cancellation before the whole Commission. On information and belief, the OLCC's dissatisfaction with the ruling was based on the misinformation from Luster and Tallmadge.

76.     The Commission meeting at which the issue was to be considered was initially scheduled for June 2014, and was subsequently rescheduled to August 26, 2014.

**D.      Illegal Conduct of Luster and Bell**

77.     On August 15, 2014 -- six days before the OLCC hearing concerning cancellation of Ms. Thames license -- Luster and OLCC inspector Jeffrey Bell visited the Club, ostensibly to review video of a patron who had been arrested by police for disorderly conduct that allegedly occurred *after* the patron left the Club. The patron was 24 years old at the time. A police report made at the time of the arrest established that the patron was not charged with public intoxication. Luster and Bell had the police report when they arrived at the Club.

78.     Luster and Bell told Ms. Thames that the patron did not have her identification readily available when she was arrested and they wanted to determine if the patron -- a 24-year-old woman -- presented her identification when she entered plaintiff's premises.

79.     Luster and Bell were not the police, were not authorized to become involved in any arrest or criminal prosecution of the patron, and were in fact not involved in any arrest or prosecution of the patron. Ms. Thames agreed to cooperate with them in this visit because she feared further intimidation and retaliation.

80.     When Luster and Bell arrived at the Club, supposedly to look at video

surveillance tapes, they wore dark, law enforcement uniforms. They wore ballistic vests on the outside of their garments. They had five-star badges usually associated with law enforcement affixed to their chests. They wore weaponry belts around their waists and diagonal sashes with radios attached.

81.     Luster and Bell demanded to see video of the patron's entry into the Club, as well as other camera angles showing whom the patron was with, where she was sitting and what she consumed.

82.     The only place where that video could be displayed was in Ms. Thames' office, a relatively small room measuring approximately 12 by 12 feet. Because she was so intimidated by Luster and Bell, Ms. Thames asked her father to sit in on this conversation. The room was very crowded with the four inhabitants. Until Luster and Bell marched Ms. Thames through her Club in handcuffs, into her parking lot, all events described below occurred in that small 12 by 12 foot space.

83.     While running the video in Ms. Thames' office, Luster and Bell asked her many questions beyond their stated purpose for the visit. Ms. Thames tried to answer those questions because she feared further intimidation and retaliation.

84.     At one point, Ms. Thames asked the two for business cards. Luster refused. Because of Luster's dress and demeanor at that time, because Luster had made false and outrageous accusations before the hearings officer on February 12, 2014, because the hearing officer had not believed Luster's testimony given under oath, and because the OLCC meeting at which the hearing's officers recommendations were to be considered was just five days away, Ms. Thames became very uncomfortable with their presence and their *ad hoc* interrogation. She felt like Luster and Bell were trying to scare and intimidate her, which they did.

85.     In the course of Luster and Bell's interrogation, Ms. Thames' father asked some questions and made some statements in support of his daughter. Luster asked sarcastically if he was an attorney and when Mr. Thames said he was not, Luster told him it was "illegal to practice

law without a license," so he should be quiet and not interfere in "official business."

86. Ms. Thames then asked to record the conversation on her phone. Luster and Bell agreed.

87. At what Ms. Thames thought would be the conclusion of the meeting, she asked if Luster and Bell were satisfied with what they had seen and if they needed to see anything else. She then picked up her phone to stop the recording and began moving away from the small corner of the room, where she was standing with Luster and Bell surrounding her.

88. At that point, Luster charged toward Ms. Thames and tried to take her cell phone away forcibly, stating, "I'll take that." Ms. Thames tried to retain possession of her phone, which contained numerous business records and personal information, reminding Luster that she had his permission to record the conversation. Ms. Thames asked why Luster was trying to take her phone. He said: "Because I can. It's now evidence in our criminal investigation."

89. Ms. Thames' father then asked, "What criminal investigation?" Neither Luster nor Bell answered that question.

90. Ms. Thames immediately asked Bell to call the police, thinking they would come and help her.

91. Luster then threatened that unless Ms. Thames surrendered her private cell phone to him, he would arrest her.

92. At that moment, Ms. Thames' cell phone rang and she could see it was a call from her son. She asked Luster if she could take the call. Luster continued to try to take the phone from her. Luster grabbed Ms. Thames' right wrists, spun her around, started to place her wrist in handcuffs and squeezed her phone from her hand. Luster said, "you are under arrest" and ordered Ms. Thames to "stop resisting."

93. When Luster applied the handcuffs, Ms. Thames told Luster that the cuffs were too tight and that she was undergoing medical tests to diagnose chronic pain in her hands, wrists, and arms. Luster did not loosen the cuffs.

94.     While this was happening, Ms. Thames' father told her to cooperate, observing that she was dealing with a couple of "rogue cops," who were retaliating against her for her truthful testimony at the administrative hearing. Bell told Ms. Thames and her father that the Portland Police had been contacted and were en route.

95.     Bell again ordered Ms. Thames' father to be quiet and threatened to arrest him as well if he continued to intervene in their mistreatment of his daughter.

96.     Mr. Thames then asked Bell for the telephone number for the OLCC Executive Director and said that he intended to call that person and notify him that his agents were at the club, harassing and physically abusing his daughter under false charges, illegally confiscating her cell phone, and physically assaulting her. Bell gave Mr. Thames a business card identifying OLCC Regional Manager Shannon Hoffeditz as his immediate supervisor. Mr. Thames spoke with Hoffeditz, told her what was happening, and asked that she inform Marks.

97.     Luster and Bell then marched Ms. Thames, in handcuffs, through her club, past her customers and staff, and made her stand in the hot, midday sun, near the inspectors' car, while they compared their notes concerning the incident. This was approximately 1:30 in the afternoon.

98.     A police officer eventually arrived. Ms. Thames and her father thought the police were there to rescue them from this nightmare. Instead, the police officer said he was there only for "transport." The police officer also said he could not take Ms. Thames to jail until Luster and Bell released her. Luster and Bell took 30 to 40 additional minutes to do so, while Ms. Thames stood in the hot parking lot, handcuffed.

99.     Before transporting Ms. Thames to jail, the police officer admonished Luster that there are rules against confiscating a private person's cell phone. Luster admitted knowing of those rules but said this case involved evidence of the commission of a criminal offense.

100.    During that entire time -- all told, approximately one and one half hours -- Ms. Thames was standing in her parking lot, in midday heat, while her customers and employees

watched Luster and Bell make a spectacle of her. Ms. Thames asked Luster if she could get in the car or go back inside due to the heat, her father's health, and the spectators gathered in the Club parking lot. Luster refused that request, saying, "I want you to stand over here in plain sight for everyone to see."

101.     Eventually Ms. Thames was transported by the police officer to jail at the Multnomah County detention center. Bell and Luster were there when she arrived. Bell, Luster and the police officer paraded her into the jail for booking. Luster and Bell were smirking at Ms. Thames and acting in a belligerent manner during the jail intake process. Luster and Bell had her booked for resisting arrest, tampering with evidence, attempting to escape and interfering with a peace officer.

102.     After spending approximately 10 hours in custody, Ms. Thames was released from the jail. But plaintiff was not given her cell phone back upon release. She did not know where her cell phone was or who had access to its significant, personal and business information. Ultimately, the Multnomah County District Attorney's Office declined to prosecute Ms. Thames.

103.     Because Ms. Thames' phone was potentially in the hands of the OLCC, she feared what OLCC employees -- especially Luster and Bell -- might have planned for her next. She feared for her own safety and that of her family, if her personal information, including contact phone numbers, photographs and the like, were in the possession of Luster and Bell. Ms. Thames thought she was utterly at the mercy of Luster and Bell and wondered what their next move would be. She arranged for her adolescent daughter to live with her father for the next two weeks, fearful for her safety. Plaintiff still fears for her safety and that of her family.

104.     The cell phone was not returned until Tuesday, August 19, 2014 -- four days after Luster and Bell intimidated, assaulted, humiliated and falsely arrested Ms. Thames.

105.     In the meantime, OLCC representatives, who knew what Luster and Bell did to Ms. Thames on the day of her false arrest, did nothing whatsoever to contact or help her. Many OLCC representatives knew at the time that attorney Duke Tufty was Ms. Thames' lawyer in

OLCC matters.  No one attempted to contact Mr. Tufty that weekend either.

**E.    OLCC defendants' attempts to make plaintiffs believe they were acting in good faith.**

106.    Beginning on August 19, 2014, OLCC representatives engaged a disingenuous campaign to convince Ms. Thames that they deeply regretted what Inspectors Luster and Bell did to her on August 15, 2014 and that they wanted to help her business thrive.  On information and belief, OLCC representatives continued this campaign for approximately six-months - - in order to prevent Ms. Thames from filing a tort claims notice.

107.    On August 19, 2014, Ms. Thames' then attorney Duke Tufty received a call from Executive Director Marks saying he was aware of what happened to Ms. Thames on August 15, 2014 and the OLCC was conducting an investigation into those events.

108.    An investigation of Luster and Bell's assault and false arrest of Ms. Thames did in fact occur.  She and her father were both interviewed.  On December 9, 2014, Jill Goldsmith, the person who did the investigation, sent Ms. Thames an email saying she had completed the investigation and that she should "contact the OLCC directly to find out what they are willing to share with respect to my report."   Ms. Thames repeatedly contacted the OLCC directly and requested a copy of the final report of the investigation.  The OLCC refused and still refuses to give her a copy.

109.    On August 19, 2014, Executive Director Marks also told Ms. Thames' attorney that he wanted to get Ms. Thames' phone back to her and that Director of Public Safety, John Eckhart, wanted to deliver Ms. Thames' phone to her personally.

110.    On August 20, 2014, Marks decided to delay the OLCC meeting scheduled for the next day, at which defendants were to challenge the administrative law judge's recommendation that Ms. Thames not lose her license.  OLCC staff reported that delay to Ms. Thames.  The issue was subsequently placed on the Commission's October 2014 agenda.

111.    On August 22, 2014, a meeting occurred at the Club between Ms. Thames, her

father, John Eckhart, Executive Director Marks and OLCC Administrative Process Director, Joshua Williams. Williams is a lawyer and had previously been a county prosecutor in Oregon.

112. Eckhart told Ms. Thames that they had been trying to get in touch with her. If anyone from the OLCC had tried to contact her, they left no paper trail. No messages were left for her at the Club or at her home or anywhere else. The OLCC representatives returned her phone and told Ms. Thames they wanted to help her.

113. When Ms. Thames brought up her arrest five days before, one of the OLCC representatives asked if she had engaged an attorney to represent her with regard to the arrest. She said that she had not yet done so. They said that they could not speak about the events of that day. They said they were there, instead, to *help* her as a licensee. They said they wanted to develop a more cooperative relationship between the OLCC and licensees. They said they hoped to earn Ms. Thames' trust.

114. Ms. Thames reiterated the formal request she had made February 4, 2013 -- 18 months before -- that the restrictions on her license that had been imposed on her since she became the licensee in 2010, described in Paragraph 4 above, finally be removed.

115. Josh Williams assured Ms. Thames that the OLCC was working on lessening the sanctions for violating the restrictions. He observed that it shouldn't be "hiding in a bush -- Ha! We caught you! One false step and you lose your license!" Ms. Thames agreed.

116. On September 2, 2014, Ms Thames sent an email to Marks, Eckhart and Williams. It said: "My dad and I appreciate all of the information that you have shared with us concerning the new direction that the OLCC is pursuing." She proposed a formal meeting with OLCC representatives "to attempt to bring resolution to pending issues as a first step." The email also said:

> "We are sure you are well aware of the damages that have been done to me as a female minority business owner by individuals under your command who acted without respect and due process in the performance of their duties."

117.     On September 23, 2014, another meeting occurred at the Club between Ms. Thames and OLCC officials.  Executive Director Marks and Williams attended that meeting as well.  Marks told plaintiff that hers was the first licensed establishment he had ever visited.  Marks said he had been appointed by the governor to "change the culture" at the OLCC and to "clean this up."  He told Ms. Thames it would "take time," that changes would not come overnight, and that she should "trust us." Marks also sympathized with Ms. Thames when she discussed the restriction preventing the bartender from serving more than one drink to a patron at a time.  He noted that he always orders his whiskey shot with a "beer back."

118.     Marks also told Ms. Thames that he was leaving on a European vacation soon, but that his deputies had full authority to oversee her request to remove plaintiff's restrictions.

119.     Williams told Ms. Thames at that meeting that she would not have to attend the October OLCC meeting either, promising, "I will make all of that go away."

120.     On October 3, 2014, another meeting occurred at the Club between Ms. Thames and OLCC officials including Eckhart, Williams and Hoffeditz.  Ms. Thames repeated her outstanding request, made on February 4, 2013 -- at that point, 20 months earlier -- to lift the restrictions.  Hoffeditz told Ms. Thames that she would be working side-by-side with the license investigator to review the Club's restrictions.

121.     As of October 3, 2014, after hearing the promises made by the OLCC representatives at above-described meetings, Ms. Thames was cautiously optimistic about the likelihood of the restrictions being lifted and of regulatory interferences with her business ending.  After all, at that point, the restrictions had been in place for four years and had never been violated:  Ms. Thames had a 100% compliance record.

**F.      Further failure by OLCC to process request for removal of restrictions.**

122.     However, on October 29, 2014 and November 16, 2014, Hoffeditz sent Ms. Thames over 30, multi-part questions that had nothing to do with the restrictions at issue.   They did not involve the parking lot.  They did not involve the number or volume of drinks sold to

customers.

123.    Ms. Thames was obviously frustrated with the extraneous questions, in light of the OLCC's failure to respond to her repeated requests to lift the draconian restrictions for 20 months, of her Club's perfect OLCC compliance record, and of the seeming assurances from OLCC Director Marks himself, before he left on his European vacation, that OLCC employees would work (in good faith, Ms. Thames incorrectly assumed) to get the restrictions lifted.

124.    Because of the breadth and scope of Hoffeditz's request, Ms. Thames suggested to Josh Williams that the questions would best be addressed in a face-to-face meeting.  The OLCC agreed to have such a meeting, but scheduled it for January 22, 2015 - - two months later and 22 months after Ms. Thames requested that the restrictions be removed.

125.    Prior to that meeting, Ms. Thames called Josh Williams.  During that call, Williams said that his impression was that only a small portion of what his colleagues were asking for seemed even remotely relevant to the restrictions.  He then said:  "what they are trying to establish is a history case."  Ms. Thames was extremely upset to hear that, despite what she had been led to believe, the defendants were not working to remove restrictions, but were in fact working to permanently cancel her license.

126.    Ms. Thames' meeting with the OLCC occurred on January 22, 2015 at the OLCC field office.  That was just short of two years after she requested in writing that the restrictions be withdrawn.  At that meeting, OLCC representatives, including Hoffeditz, presented her with a list compiled by OLCC License Investigator, Dan McNeal, describing 21 events that supposedly had some bearing on Ms. Thames' written request that the license restrictions be lifted.  Thirteen of the 21 events on the OLCC list occurred in 2012 and 2013.  None of the 21 events described resulted in a citation or other reprimand issued to the Club by the OLCC or any of the governmental entity.  Several of the events were the result of successful efforts by Club security staff to prevent potentially violent people from entering the Club.  The reports recited hearsay statements of people accused of misconduct and witnesses whose credibility was utterly

unknown to any OLCC defendant.  Because the list was compiled from police reports, the OLCC defendants had no idea whether any of the listed events actually occurred, whether the hearsay statements were determined to be true or false, or whether any of the events led to convictions. Many of the reports concerned events that did not even happen at the Club.

127.    The OLCC essentially required Ms. Thames to explain what she was going to do about a dancer who had supposedly skipped out on cab fare after leaving the Club on January 4, 2013 - - more than two years earlier, about a dancer who was arrested for prostitution nowhere near the Club, about a woman who claimed that she had been "jumped" during a traffic stop by two Exotica dancers in March 2013, and about the conduct of people who were in a car in the Club parking lot in March 2013, who supposedly left the lot, drove away, committed a traffic infraction and then attempted to elude arrest.  There was no evidence that the people in the car were ever even in the Club.  The OLCC defendants also required Ms. Thames to explain an alleged incident of domestic violence that occurred at the Econo Lodge across the street from the Club.  That event supposedly occurred in December 2013.  More "recently," in August of 2014, a person lost his credit card at some point during the night and thought it might have been at the Club.   There was no evidence anywhere to support any of these claims and the OLCC defendants knew that.  Yet the defendants employed by the OLCC required Ms. Thames to explain these events as a prerequisite to considering lifting the restrictions on her license.

128.    Ms. Thames pointed out, and OLCC representatives had to have known, that she could not possibly respond to those questions without seeing the underlying police reports. Hoffeditz said she would "look into" getting those reports to her.  In the interim, Hoffeditz asked Ms. Thames to provide the Club's security policies and procedures, dancer policies, patron dress code, and other information.   The OLCC already had the Club's security policies and procedures, dancer policies, patron dress code, and the like.  Ms. Thames had provided those things to Luster and Tallmadge two years before.

129.    Recognizing that she had a perfect compliance record with the OLCC for her

entire four and a half years of ownership, Ms. Thames was perplexed by the detailed and undue scrutiny defendants were giving to her request that the license restrictions be lifted. So, thinking that perhaps there was something in her OLCC file of which she was unaware, Ms. Thames requested a copy of that file shortly after the January 22, 2015 meeting. Her review of her file confirmed what she thought -- she had a 100% compliance record during the entire four and one-half years of her ownership.

**G.    Office of Neighborhood Involvement and final demise of the Club.**

130.    The Office of Neighborhood Involvement is a City bureau. Its mission statement is as follows:

> "Promoting a culture of civic engagement by connecting and supporting all Portlanders working together and with government to build inclusive, safe and livable neighborhoods and communities."

131.    The Portland City Council authorized the Office of Neighborhood Involvement to administer the City's time, place and manner ordinance, the purpose of which is "to provide for reasonable time, place and manner regulations of the nuisance aspects of those establishments that serve alcoholic beverages where adverse effects occur with regard to the surrounding community."

132.    The Club is located in the middle of a general employment zone. The emphasis of that zone is on industrial and industrial related uses without potential conflicts from interspersed residential uses. There were no neighboring residences to the Club. During the entire period of Ms. Thames' operation of the Club, no neighboring residents filed any complaints with the Office of Neighborhood Involvement.

133.    On March 10, 2015, Ms. Thames received an email from the Office of Neighborhood Involvement asking to schedule a meeting with Liquor License Specialist, Mike Boyer, "in regards to ongoing issues and a Time, Place, and Manner warning." Ms. Thames was taken aback by the reference to the "ongoing issues," because there were no ongoing issues

involving her Club, except that she is black and many of her patrons and staff are black. In over four years of owning and managing Exotica, Ms. Thames had never been adjudicated as having an OLCC violation, or as allowing gang members, prostitution or illegal drug use, sale or distribution on the premises.

134.    On March 19, 2015, the meeting was held at Portland City Hall with Ms. Thames, her father, a Club security staff member, Boyer, two Portland Police officers and OLCC inspector David Lattin. No member of the Portland Police gang taskforce was in attendance. Ms. Thames and her security staff member were asked about a January 13, 2015 incident at the Club, when a fight broke out in the Club between patrons, the police were called, and three security officers and the DJ on duty successfully required those involved to leave the Club.

135.    Ms. Thames and her security officer were surprised that they had been summoned to City Hall about that incident. They explained that they had complied with all OLCC requirements and had followed the Club's approved security protocols when ejecting the disruptive patrons.

136.    Ms. Thames heard nothing more from the OLCC about her request to remove the restrictions until March 22, 2015 - - another two months after the last meeting and 25 months after she requested the restrictions be removed. Hoffeditz emailed Ms. Thames saying the OLCC representatives were going to meet soon to discuss her "licensing matters," and gave her until March 27, 2015 to provide the information they had requested in the January 22, 2015 meeting. Ms. Thames had already provided that information to the OLCC. She nevertheless promptly provided that information again prior to the deadline on March 27, 2015.

137.    On April 10, 2015, Ms. Thames received a call from Josh Williams saying that OLCC employees had just convened a meeting concerning the Club and an OLCC staff member had announced that Ms. Thames had not provided the requested information. Williams had left the meeting to call Ms. Thames. She told Williams that she had, in fact, sent the information to

Hoffeditz and McNeal via email on March 27, 2015. Williams responded that that was odd because neither Hoffeditz nor McNeal acknowledged receipt of that information at the meeting. Williams asked Ms. Thames to email the information to him immediately so it could be used at the meeting. She did so immediately.

138. That is the last Ms. Thames ever heard from the OLCC about her license restrictions.

139. On April 25, 2015, at approximately 1:15 am, a group of 10 to 15 Hoover Crip gang members attempted to enter the Club. The Club did not allow gang members. As they had been trained to do, the Club's security team identified the individuals as Hoover Crips by their attire and denied them entry. The Hoover Crips complied with the Club's security team's directives, moved away from the entryway to the Club and walked into the parking lot, where an argument broke out among the gang members. Two Club security officers approached and gave them verbal commands for them to get in their cars and leave. One of the male gang members told the security officer on duty that they "have this under control and are leaving." All of the individuals returned to their cars and the security believed that the situation was under control. Then, out of nowhere, one of the gang members brought a firearm out of his car and started shooting into the parking lot. Two people were wounded. Unlike contemporaneous shootings that occurred at the nearby McDonald's and other clubs not owned by black people, no one was killed at the Club. In over four years of owning and managing Exotica, that was the first time shots were ever fired on the premises and they were fired by someone who had never even entered the Club.

140. Chapter 14B.120 of the Portland City Code deals with "Time, Place and Manner Regulation of Establishments that Sell and Serve Alcoholic beverages."

141. That Chapter essentially allows the Chief of Police or the Director of the City's Office of Neighborhood Involvement, upon determining that a "nuisance activity" has occurred on a licensed premises, to send a written notice to the licensee of the nuisance activity, to request

that the licensee provide a written response within 10 business days either disputing the occurrence of the nuisance activities or providing specific proposals to abate the nuisance activities and preventing such nuisance activities from reoccurring, and, upon receipt of such notice, to work with the licensee in good faith to develop a nuisance abatement plan.

142. On or about May 5, 2015, Ms. Thames received a letter from Portland Police Captain Mark Kruger. Ms. Thames did not receive any letter from the Chief of Police or the Director of the Office of Neighborhood Involvement. Kruger's letter said that one or more nuisance activities had occurred at the Club and invoked the provisions of Section 14B.120 of the Portland City Code. After the April 25, 2015 shooting, Captain Kruger wrote that Ms. Thames "must provide a written response within ten (10) business days after the date of this letter either disputing the occurrence . . . or proposing a course of action that will abate this nuisance activity."

143. On May 19, 2015, Ms. Thames responded to Captain Kruger with a letter stating that she believed further investigation would show, "by irrefutable physical evidence," that:

- "the incident did not arise out of my establishment's service of alcoholic beverages." "the incident occurred outside of the establishment after my security people had refused to allow admission to subjects who were not regular patrons appearing to have come from a previous event or gathering."

- "My security staff followed my establishment's Standard Operations Procedures by not allowing entry to people who were showing visible signs of intoxication and had provided false ID. Staff provided several reasons to deny entry and did not utilize "gang affiliation" as a determining factor since it was also observed that they were wearing what is known to us as Hoover Crip gang apparel, specifically Houston Astro baseball caps."

- "Although the group verbally disagreed with security about being denied entry, the security staff did not feel there was a threat against staff, just disagreement, but cooperation to exit was ultimately accomplished."

- "After we successfully stopped the group, in whole, from entering, they walked outside of the doors and notified the

remaining individuals outside of the doors that we were denying entry of their group. '

- "As they were returning to their vehicles, an unfriendly verbal exchange of words occurred between two individuals within the group. An attempt was made by two security staff members to help other people from the group break up what immediately escalated into a physical altercation."

144.    Ms. Thames also acknowledged in her letter to Captain Kruger that, in hindsight, her security staff should have called the police earlier. She added that: "Training is already in progress to address this area[]." Ms. Thames also recapped all that she had done to assist the Portland Police in its efforts to combat citywide gang violence:

> "I have worked proactively with Gang Task and initiated a meeting this past January with PPB personnel Lieutenant Michael Krantz, Officers Travis Law and Anthony Zoeller, in an effort to become more educated on current gang activity in the surrounding areas, as well as requests advice and information on how to identify gang members and turn problems away in hoping for outcomes that are positive. I also expressed my concerns that I felt it is was important for me to establish procedures and provide training to my staff to avoid incidents in the best manner possible by not aggravating people so they will want to cause harm or retaliate against us. "

145.    Ms. Thames wrote that, "since April 25th, I have done the following":

> "- Re-hired security staff that have more experience and training in dealing with gangs, crowd control, volume of problematic situations occurring with larger crowds of people at entertainment venues in Portland
>
> - Received an inspection of our existing surveillance equipment and awaiting a report of recommended improvements (to be completed by June 1, 2015)
>
> - Will be fixing and using the camera we had been using to take a video recording of IDs at entry of patrons (to be completed by June 1, 2015)
>
> - Discussed and emphasized with my staff the importance of calling the police when we are faced with police matters, establishing procedures to address
>
> - Implemented stricter dress codes and re-entry policies
>
> - Required 2 way radios remain in use from 9 pm to close between the parking lot security staff and the door security staff

- Increased lighting both inside and outside, (still in progress)

- Establish and practice an emergency situation drill with all staff (ongoing modifications and training taking into consideration staff turnover and pertinent information we may receive)"

146.    On or about May 27, 2015, plaintiff was summoned to City Hall to meet with numerous representatives of the Portland Police drug and vice squad, the Office of Neighborhood Involvement, the OLCC and Fire Marshall Rob Cruser.  Neither the Chief of Police nor the Director of the Office of Neighborhood Involvement attended. The stated purpose of the meeting was to discuss an abatement plan.  There was no discussion of Ms. Thames' May 19, 2015 letter or the numerous measures she had taken to aid the City and the Portland Police in controlling the citywide gang activities.  There was no discussion of Ms. Thames' specific proposals to abate the nuisance activities and prevent such nuisance activities from reoccurring.

147.    Instead, Ms. Thames was told that the City would seek to require the Club to close at midnight for 90 days.  As the attendees at the meeting knew, the highest volume of business at the Club occurred between midnight and two in the morning.  The attendees at the meeting said that was required because of the "serious incidents that happened" at the Club. Boyer referred to the January 13, 2015 altercation at the Club as "a shooting."  When Ms. Thames pointed out that no shots had been fired that day, Boyer responded:  "That doesn't matter."  Boyer said the Club was in need of a "prolonged cooling off period." They said this well over a month after shots were fired in the Club parking lot.  Shots had never been fired at the Club before the April 24, 2015 incident and no shots were fired at the Club since.

148.    All attendees supported the midnight closure requirement and no discussion about Ms. Thames' proposals was allowed.  Boyer told Ms. Thames that if she did not agree to close at midnight for 90 days, the City would seek to require the Club to close at midnight for an entire year.

149.    Ms. Thames said the gang problem is a community problem and that, in light of the Club's exemplary record before the April shooting, she should not be blamed and her

business should not be targeted for what amounted to closure. Stephanie Reynolds of the Office of Neighborhood Involvement responded that, of the thousands of liquor licenses issued in Oregon every year, only a handful attract gang members. To the contrary, the Club had an exemplary record of keeping gang members out.

150. Again, at that point, the only verified incident at Exotica involving gang members was the April 2015 shooting in the parking lot. Numerous other Portland businesses had experienced violence, including shootings, at about the same time. On information and belief, neither the OLCC nor the City took measures against those businesses aimed at substantially curtailing their ability to do business and eventually shutting them down entirely.

151. On June 4, 2015, Boyer sent Ms. Thames a proposed abatement plan. Among other things, it proposed that the Club be required to close at midnight for 90 days. On information and belief, no abatement plan requiring midnight closure was forced upon any white-owned establishments where shots were fired in the same general time period.

152. On June 9, 2015, Ms. Thames sent an email to Captain Kruger that said:

> "Captain Kruger,
>
> I am patiently waiting for a response to my letter to you dated May 19, 2015.
>
> My response letter was following the instruction as mentioned in your letter of May 5, 2015 explaining that I had 10 business days to dispute or propose a course of action that will abate the Nuisance Activity as defined in Portland City Code 14B.120.020 (F) 10-15.
>
> Please send your response to this email address emaildonnat@aol.com
>
> I have attached a copy of the letter sent to your attention on May 19, 2015."

153. On the evening of June 9, 2015, Boyer sent Ms. Thames an email that began:

> "Good evening Donna,
>
> There seems to be some confusion on your part with the process for the Time Place Manner Violation at Exotica. I would like to

clarify this process and provide a recap of what has transpired to this point."

154. Boyer then purported to outline, "what had transpired to this point." One bullet point in Boyer's timeline said:

> "During the Time Place Manner Abatement Meeting, City of Portland and Oregon Liquor Control Commission resources held a discussion with you and three of your staff members. During that conversation the incident on April 25th were reviewed along with options for Exotica to improve safety of its' operation."

That statement was false. No "discussion was held" in which "the incident on April 25th were (sic) reviewed along with options for Exotica to improve safety of its' (sic) operation." As explained above, Ms. Thames was told, in no uncertain terms, that she could either accept midnight closure for 90 days or face such a closure for a year.

155. Boyer's June 9, 2015 email proceeded, in a threatening manner, to scold Ms. Thames for not acceding to the City's demands:

> "At the end of the Time Place Manner Abatement Meeting, I directly advised you that I would be emailing you a proposed Time Place Manner Abatement Plan for your consideration. You were also advised that you would have one week to review that proposed Time Place Manner Abatement Plan and get back to me with how you like to move forward to resolve your Time Place Manner Violation.
>
> The proposed Time Place Manner Abatement Plan that I've noted in the prior bullet point was emailed to you by me on June 4th at 12:33pm (see attachment). Many of the same people that are copied on this email were also included in that correspondence.
>
> If the City of Portland does not receive a response in regards to our proposed Time Place Manner Abatement Plan, I will be filing this Time Place Manner Violation with the Code Hearing Officer for the City of Portland. During that process I will be requesting more stringent means to abate that safety concerns at Exotica with a much lengthier duration than 90 days as it is listed in the proposed Time Place Manner Abatement Plan.
>
> Once again I have attached the proposed Time Place Manner Abatement Plan for consideration.
>
> **Please respond to request by 5pm tomorrow."**

156. On June 11, 2015, Ms. Thames sent a lengthy email to Boyer that provided

detailed, point-by- point responses to all nine proposals in the proposed abatement plan.

157.    On June 18, Ms. Thames wrote a detailed and increasingly desperate email to Boyer, responding to the statements made in Boyer's June 9, 2015 email.    She copied numerous City and OLCC employees on her email, including Mayor Charles Hales, Neighborhood Involvement Livability Program manager Theresa Marchetti, Shannon Hoffeditz, and John Eckhart.  The email first asked for the appearance of respect:

> "In response to your email and timeline of our communication, I'd like to begin by letting you know I would prefer you address me by my formal name, Ms. Thames, in all future business correspondence from today forward. As a member of the Minority Community, I am hopeful that Police Chief O'Dea's statements, made to the Skanner Newspaper in January of this year, are of some value to this process in that he has publicly stated his intent to pursue a more trusting relationship with the Minority Community with more focus on Community Partnership."

158.    She then turned to the proposed abatement plan.  Ms. Thames pointed out that she had already accomplished many of the requirements of the abatement plan, such as sending her staff to gang task force training, parking lot improvements and surveillance system improvements.  She asked for clarification about certain other requirements. She pointed out that the City was blaming Ms. Thames for the citywide gang problem, rather than working with her to see how she could contribute to the solution by the way she managed her business.  She noted that she had not yet "received any response to [her] letter addressed to Captain Kruger dated May 19th, 2015."  As a result, she pointed out, "[n]othing in my letter has been 'discussed' or addressed" and "[n]one of my efforts or suggestions were discussed and none of the contents of my letter appear in your Proposed Abatement Plan.'

159.    Mayor Hales did not respond to Ms. Thames' desperate plea for help saving her business.

160.    Instead, on June 19, 2015, Boyer sent an email to Ms. Thames that said:

> "Ms. Thames,
>
> Thank you for your correspondence. The City of Portland has fully

reviewed the Time Place Manner violation for Exotica. Attached to this email is the final draft of the Abatement Plan to address this matter. You have until 5:00pm on Monday June 22nd to decide if you would like to enter into this Abatement Plan. If you choose to enter into the Abatement Plan, you can email me a scanned signed copy, or I can stop by your establishment in person and pick up signed copy and collect the remaining signatures from there. If you decide not to enter into this proposed Abatement Plan, the City will move forward with filing this Time Place Manner violation with Code Hearing Officer for the City of Portland. The Code Hearing Officer will act as an independent party to make a final decision on this matter."

161.    Ms. Thames responded on June 19, 2015, pointing out that the abatement plan attached to the Boyer email was the same as the "proposed" abatement plan he had sent on June 4, 2015. She concluded: "Therefore, on behalf of Columbia Bar & Grill, Inc, I will not be signing this Abatement Plan developed, written & decided upon by the City of Portland and its Committee of Representatives without any discussion or input from me, the Licensee."

162.    Notwithstanding the earlier claims by City representatives that there was an "emergency" and an immediate need for a "cooling off period," the City did nothing when Boyer's June 22 deadline passed. Instead, the City just waited for reality to set in and for Ms. Thames to realize that, unlike hundreds of other similar clubs in the City, whose owners were far less cooperative and diligent than Ms. Thames, the City was hell bent on putting her out of business.

163.    By July 2015, Ms. Thames was at the end of her rope. Like numerous black club owners in Portland before her, she gave up and closed her business -- after operating her business for nearly five years with a spotless regulatory record.

164.    As a result of the acts of defendants and others described herein, Ms. Thames lost her investment in the Club, her source of income, expected future profits, the ability to sell the Club for its fair market value in the future, and her career. She also suffered physical abuse, emotional distress, damage to her reputation, and other damages that will be proven at trial.

165.    On August 25, 2015 - - a full *three months* after City and OLCC employees told Ms. Thames that the very existence of her business created a community emergency, requiring a

"prolonged cooling off period," and justifying a midnight closing time - - Amy Archer, Acting

Director of the Office of Neighborhood Involvement, wrote Ms. Thames saying:

> "Dear Ms. Thames:
>
> This letter is to advise you, as the licensee responsible for
> operating Exotica, that due to your failure to enter into an
> acceptable abatement plan to resolve the Time Place Manner
> Ordinance violation, the City of Portland intends to file a petition
> with the Code Hearing's Office to address the violation. You will
> receive notice of the hearing once scheduled.
>
> If you have questions, you may contact Mike Boyer, Office of
> Neighborhood Involvement Liquor License Program Coordinator
> at 503-823-3092."

166.    In 2015, the Portland Police Gang Taskforce reported 182 gang shootings,

stabbings or assaults in Portland.  On information and belief, none of the businesses in the

vicinity of such violence were targeted for the imposition of the crippling time, place and manner

restrictions that the City sought to impose on the Club.

## FIRST CLAIM FOR RELIEF

### All Plaintiffs Against All Defendants Except OLCC

### (42 U.S.C. § 1981 – Race Discrimination)

167.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 166

above.

168.    Plaintiff Donna Thames is a member of a racial minority who owned and operated

a black club in Portland.

169.    Defendants through government action deprived plaintiffs of the same right to

make and enforce contracts as that of white citizens. Those contracts are described in Paragraph

40 above.

170.    Defendants intentionally discriminated against plaintiff Donna Thames because of

her race based on the following:

a.      Defendants were aware of the discrimination and failed to take steps to

improve; and/or

    b.    Defendants' pattern of conduct was inexplicable on grounds other than race; and/or

    c.    The gross disparity in treatment of white-owned or managed clubs versus black clubs; and/or

    d.    The selective enforcement of regulations resulted in racial animus.

171.    Defendants deprived plaintiff Donna Thames, as the owner of a black club, and her corporation, Columbia Bar & Grill, Inc., of the same rights as white business owners and businesses to make and enforce contracts with patrons and promoters.

172.    Defendants acted with intent to discriminate against plaintiff Donna Thames on the basis of her race and/or her status as a non-white citizen and/or the race of her patrons.

173.    Defendants knew or should have known that their conduct violated clearly established statutory or constitutional rights against discrimination on account of race.

174.    As a direct and proximate result of the defendants' violation of plaintiffs' constitutionally guaranteed rights and their actions/inactions alleged herein, plaintiffs suffered economic loss in the form of loss of investment, lost profits and loss of future business, in an amount to be proven at trial, but no less than $2,500,000, plus pre-judgment and post-judgment interest.

175.    As a direct and proximate result of Defendants' actions as alleged herein, Plaintiffs have suffered non-economic damages in the form of loss of reputation, bodily harm, emotional and mental distress, degradation, embarrassment, and humiliation for which Plaintiff seeks compensation in an amount to be proven at trial, but no less than $5,000,000.

176.    Defendants' actions herein were intentional, willful, and with reckless disregard to plaintiffs' rights. Such conduct exceeded the bounds of social toleration and is of the type that punitive damages deter. Plaintiffs hereby request an award of punitive damages in the amount of $15,000,000.

177.     Plaintiffs have hired legal counsel to prosecute their claim and are entitled to reasonable attorneys' fees and costs incurred, including expert witness fees, pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

### By Donna Thames Against Luster and Bell

### (42 U.S.C. § 1983 – Violation of 4th Amendment)

178.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 166.

179.     Plaintiff has a right to be free from unreasonable seizures under the Fourth Amendment.

180.     Defendants Luster and Bell arrested Ms. Thames without probable cause to believe she committed any crime under Oregon law.

181.     As a direct and proximate result of defendants' violation of plaintiff's constitutionally guaranteed rights and their actions/inactions alleged herein, plaintiff has suffered and is entitled to recover compensatory and punitive damages as described in Paragraphs 174 through 177 above, the allegations of which are incorporated herein.

182.     Ms. Thames has hired legal counsel to prosecute her claim and is entitled to reasonable attorneys' fees and costs incurred, including expert witness fees, pursuant to 42 U.S.C. § 1988.

## THIRD CLAIM FOR RELIEF

### All Plaintiffs Against All Defendants

### (42 U.S.C. § 1983 – Violation of Fourteenth Amendment Equal Protection)

183.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 166.

184.     Plaintiffs have a right to equal protection under the law without regard to race as guaranteed by the Fourteenth Amendment in their position as citizens and corporations of the United States.

185.    By the conduct described above, defendants, acting under color of state law, acted with intent or purpose to racially discriminate against plaintiffs by depriving plaintiffs of their right to equal protection by unlawfully treating plaintiffs differently than similarly situated clubs that are not owned by or do not cater to a black clientele.

186.    Such racially disparate treatment resulted in the loss of plaintiffs' business, reputation, and goodwill.

187.    Such racially disparate treatment was without adequate justification and resulted in substantial economic and non-economic harm to plaintiffs.

188.    Individual defendants' actions were carried out in furtherance of a longstanding, official policy, practice, custom or decision of defendant City treating black clubs differently than clubs catering to non-black patrons that continues to the present. By carrying out that policy, practice, custom or decision, the City has discriminated unlawfully against black clubs in violation of the Equal Protection Clause.

189.    Defendants City's policy, practice, custom or decision to treat clubs differently based on race of ownership or clientele was the moving force behind plaintiffs being deprived of her right to Fourteenth Amendment right to equal protection.

190.    As demonstrated by the actions described above, all defendants, except the City, by concerted action and agreement, conspired to, intended to, and did in fact deprive plaintiffs of their Fourteenth Amendment right to equal protection.

191.    As a direct and proximate result of defendants' violation of plaintiffs' constitutionally guaranteed rights and their actions/inactions alleged herein, plaintiffs have suffered and are entitled to recover compensatory and punitive damages as described in Paragraphs 174 through 177 above, the allegations of which are incorporated herein.

192.    Plaintiffs have hired legal counsel to prosecute their claim and are entitled to reasonable attorneys' fees and costs incurred, including expert witness fees, pursuant to 42 U.S.C. § 1988.

## FOURTH CLAIM FOR RELIEF

### All Plaintiffs Against All Defendants

### (42 U.S.C. § 1983 – First Amendment)

193.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 166.

194.     Plaintiffs have a protected right to free speech and expression as guaranteed by the First Amendment to dance, play hip-hop music and host musical events at which hip-hop artists perform without restriction based on content and/or viewpoint.

195.     Plaintiffs' club specialized in catering to a predominantly black audience, in part by playing hip-hop music and curating hip-hop events.

196.     By the conduct described above, defendants, acting under color of state law deprived plaintiffs of their First Amendment rights to freedom of speech andexpression.. Such deprivation resulted in the loss of plaintiffs' business, reputation, and goodwill.

197.     The conduct of defendants was not content-neutral as defendants did not subject similarly-situated clubs that did not play this type of music to such illegal actions, regardless of noise or public safety reports or actual decibel levels recorded.

198.     Defendants' actions had the result of chilling plaintiffs' speech and forcing plaintiffs out of business. Such deterrence was a substantial or motivating factor for defendants' actions.

199.     Individual defendants' actions were carried out in furtherance of a longstanding, official policy, practice, custom or decision of defendant City to treat black clubs featuring hip-hop differently than clubs catering to a non-black audience playing other types of music. By carrying out that policy, practice, custom or decision, the City has discriminated unlawfully against black clubs. This policy, practice, custom or decision amounts to a violation of plaintiffs' right to free expression under the First Amendment.

200.     Defendant City, through the enforcement of its official policy, practice, or custom or decision described above, discriminated against plaintiffs' right to free speech and expression

on a content-neutral and/or viewpoint-neutral basis, and against plaintiff Donna Thames' right to associate with her black clientele.

201.    Defendant City's above-described policy and long-standing practice of treating clubs differently based on type of music played was the moving force behind plaintiffs being deprived of their right to free speech and expression.

202.    As demonstrated by the actions described above, all defendants, except the City, by concerted action and agreement, conspired to, intended to, and did in fact deprive plaintiffs of their First Amendment right to freedom of speech and expression.

203.    As a direct and proximate result of defendants' violation of plaintiffs' constitutionally guaranteed rights and their actions/inactions alleged herein, plaintiffs have suffered and are entitled to recover compensatory and punitive damages as described in Paragraphs 174 through 177 above, the allegations of which are incorporated herein.

204.    Plaintiffs have hired legal counsel to prosecute their claim and are entitled to reasonable attorneys' fees and costs incurred, including expert witness fees, pursuant to 42 U.S.C. § 1988.

## FIFTH CLAIM FOR RELIEF

### All Plaintiffs Against All Defendants

### (42 U.S.C. § 1985(3) – Conspiracy to Interfere with Civil Rights)

205.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 166.

206.    All defendants except the City conspired to deprive plaintiffs of the equal protection of the laws and/or of equal privileges and immunities under the laws in furtherance of its goal to harm Plaintiffs and their interests as alleged supra.

207.    Defendants' actions were motivated by a race-based animus.

208.    Defendants committed acts in furtherance of their conspiracy including:

a.    Perpetuating a pretext of nuisance complaints and other disturbances with the improper purpose of increasing police presence;

b.     Refusing to allow a hearing on plaintiffs' request to remove the restrictions on her liquor license;

c.     Attempting to cancel plaintiffs' liquor license;

d.     Attempting to impose a time, place, and manner restriction on plaintiffs' business; and

e.     Taking steps to effectively shut down plaintiffs' business.

209.    Plaintiffs were deprived of the following constitutional rights: freedom of speech and/or expression, due process, and freedom from discrimination based on race.

210.    As a direct and proximate result of defendants' violation of plaintiffs' constitutionally guaranteed rights and their actions/inactions alleged herein, plaintiffs have suffered and are entitled to recover compensatory and punitive damages as described in Paragraphs 175 through 178 above, the allegations of which are incorporated herein.

211.    Plaintiffs have hired legal counsel to prosecute their claim and are entitled to reasonable attorneys' fees and costs incurred, including expert witness fees, pursuant to 42 U.S.C. § 1988.

## SIXTH CLAIM FOR RELIEF

### All Plaintiffs Against All Defendants

### (42 U.S.C. § 1986 – Action for Neglect to Prevent Interference with Civil Rights)

212.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 166.

213.    All Defendants except the City held knowledge of said conspiracy as alleged in the Sixth Claim for Relief, had power to prevent or aid in preventing such conspiracy, and neglected or refused to prevent such conspiracy. As a result, plaintiffs and their interests were harmed and they were deprived of the equal protection of the laws and/or of equal privileges and immunities under the laws.

214.    As a direct and proximate result of defendants' violations of plaintiffs' constitutionally guaranteed rights and their actions/inactions alleged herein, plaintiffs have

suffered and are entitled to recover compensatory and punitive damages as described in Paragraphs 174 through 177 above, the allegations of which are incorporated herein.

215.     Plaintiffs have hired legal counsel to prosecute their claim and are entitled to reasonable attorneys' fees and costs incurred, including expert witness fees, pursuant to 42 U.S.C. § 1988.

## SEVENTH CLAIM FOR RELIEF

### All Plaintiffs Against Defendant City of Portland

### (42 U.S.C. § 2000d—Civil Rights Act Title VI)

216.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 166.

217.     The budget of defendant City includes federal funds.

218.     As described above, defendant City treated plaintiffs less favorably than similarly-situated clubs and owners of non-black establishments, including those that did not have predominantly black clientele and/or play hip-hop music. Defendant City subjected plaintiffs to increased scrutiny and additional penalties in comparison to other similarly situated clubs.

219.     Defendant City's discriminatory actions adversely impacted plaintiffs resulting in the loss of their business and the ability to work in their chosen occupation/business area, damaging their reputations within the community, and grossly interfering with their contractual and business relationships.

220.     Defendant City's conduct resulted in the shut-down of plaintiffs' business while similarly-situated clubs with similar public nuisance or safety concerns remained open. There is no substantial legitimate justification for this disparity except for race-based animus.

221.     As a direct and proximate result of defendants' violation of plaintiffs' constitutionally guaranteed rights and their actions/inactions alleged herein, plaintiffs have suffered and are entitled to recover compensatory and punitive damages as described in Paragraphs 175 through 178 above, the allegations of which are incorporated herein.

222.    Plaintiffs have hired legal counsel to prosecute their claim and are entitled to reasonable attorneys' fees and costs incurred, including expert witness fees, pursuant to 42 U.S.C. § 1988.

## EIGHTH CLAIM FOR RELIEF

### All Plaintiffs Against Defendants Luster and Bell

### (Common Law—Assault)

223.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 166 above.

224.    The acts of Luster and Bell described in Paragraphs 77 through 105 above were undertaken in the course and scope of their employment with the OLCC.

225.    The acts of Luster and Bell described in Paragraphs 77 through 105 above constituted an intentional attempt to engage in harmful or offensive contact with plaintiff Donna Thames, coupled with the present ability to carry the intention into effect.

226.    As a direct and proximate result of defendants' actions, plaintiffs have suffered and are entitled to recover compensatory damages as described in Paragraphs 174 through 177 above, the allegations of which are incorporated herein.

## NINTH CLAIM FOR RELIEF

### All Plaintiffs Against Defendants Luster and Bell

### (Common Law—Battery)

227.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 166 above.

228.    The acts of Luster and Bell described in Paragraphs 77 through 105 above were undertaken in the course and scope of their employment with the OLCC.

229.    The acts of Luster and Bell described in Paragraphs 77 through 105 above intentionally caused harmful and offensive contact with plaintiff Donna Thames.

230.    As a direct and proximate result of defendants' actions, plaintiffs have suffered

and are entitled to recover compensatory damages as described in Paragraphs 174 through 177 above, the allegations of which are incorporated herein.

## TENTH CLAIM FOR RELIEF

### All Plaintiffs Against defendants Luster and Bell

### (Common Law--False Arrest)

231.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 166 above.

232.    The acts of Luster and Bell described in Paragraphs 77 through 105 above were undertaken in the course and scope of their employment with the OLCC.

233.    The acts of Luster and Bell described in Paragraphs 77 through 105 above intentionally caused plaintiff Donna Thames to be confined by physical force and by assertion of false legal authority.  Luster and Bell did not have legal authority to confine Ms. Thames or to cause her to be arrested and they knew that they did not have such authority.

234.    As a direct and proximate result of defendants' actions, plaintiffs have suffered and are entitled to recover compensatory damages as described in Paragraphs 174 through 177 above, the allegations of which are incorporated herein.


## ELEVENTH CLAIM FOR RELIEF

### All Plaintiffs Against Individual Defendants

### (Common Law—Intentional Interference with Economic Relations)

235.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 166.

236.    Plaintiff Donna Thames was engaged in developing and establishing a gentlemen's club in Portland dedicated to serving the City's black and multi-cultural communities.

238.  As demonstrated by the actions described above, the individual defendants interfered with plaintiffs' business relations with patrons, customers, the landlord, providers and

others by improper means and the improper motives. Specifically, by their concerted action and agreement to violate plaintiff's constitution rights, as alleged in the First through Tenth Claims for Relief above and the factual allegations incorporated therein, those defendants conspired to, intended to, and did in fact, repeatedly disrupt business at plaintiffs' club and eventually forced plaintiff Thames to close her business. Plaintiffs' were thus deprived of the economic benefits they were entitled to derive from their established business.

239.     As a direct and proximate result of defendants' actions, plaintiffs have suffered and are entitled to recover compensatory and punitive damages as described in Paragraphs 174 through 177 above, the allegations of which are incorporated herein.

## TWELFTH CLAIM FOR RELIEF

### Plaintiff Donna Thames Against Individual Defendants

### (Common Law—Intentional infliction of emotional distress)

240.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 166 above.

241.     As alleged in Paragraphs 77 through 105 above, defendants Luster and Bell, among other things, subjected plaintiff Thames to physical intimidation and assault, confiscated her phone, marched her conspicuously in handcuffs through her club and past her customers and staff, and made her stand in her parking lot in full sight of her customers and others before having her arrested without any just cause whatsoever. These concerted acts constituted extraordinary transgressions of the bounds of socially tolerable conduct.

242.     As alleged in the First through Tenth Claims for relief above and the factual allegations incorporated therein, all of the individual defendants, by their concerted action and agreement, conspired to, intended to, and did violate plaintiff Thames' constitutional rights by repeatedly disrupting business at plaintiff's club and by subjecting her to inordinate regulatory scrutiny and requirements so extreme and costly that plaintiff was eventually forced to close her business.

243.     These acts of the individual defendants' acts were intended to and did in fact inflict severe emotional and mental distress on plaintiff Donna Thames.  Alternatively, such severe emotional and mental distress was certain or substantially certain to and did result from Defendants' conduct.  Defendants' concerted acts in furtherance of such conspiracy constituted extraordinary transgressions of the bounds of socially tolerable conduct.

244.     As a direct and proximate result of defendants' actions, plaintiffs have suffered and are entitled to recover compensatory and punitive damages as described in Paragraphs 174 through 177 above, the allegations of which are incorporated herein.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants in the total amount of $22,500,000, to include the following:

1.    For economic damages in the amount of $2,500,000.

2.    For non-economic damages in the amount of $5,000,000.

3.    For punitive damages in the amount of $15,000,000.

4.    For plaintiffs' costs of suit and his reasonable attorney fees, costs, and expert witness fees pursuant to 42 U.S.C. § 1988 and ORS 659A.885.

5.    For pre-judgment and post-judgment interest, as appropriate, on all amounts due to plaintiff as a result of this action.

6.    For such other relief as the Court may deem just.

Dated this 12th day of June, 2018.


By: s/ Timothy Volpert
**Timothy R. Volpert**, OSB No. 814074
Email: tim@timvolpertlaw.com
Tim Volpert PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (503) 703-9054

**Ethan Levi**, OSB No. 994255
Email: ethan@lmhlegal.com
**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Noah Horst**, OSB No. 076089
Email: noah@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

Attorneys for Plaintiffs